IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 13-cv-00518-RBJ

WILDEARTH GURADIANS,

     Plaintiff,

v.

UNITED STATES OFFICE OF SURFACE MINING, RECLAMATION AND
ENFORCEMENT,
AL KLEIN, in his official capacity as Western Regional Director of the Office of Surface
Mining, Reclamation and Enforcement, Denver, Colorado, and
S.M.R. JEWELL, in her official capacity as U.S. Secretary of the Interior,

     Federal Defendants,

COLOWYO COAL CO. L.P. and TRAPPER MINING, INC.,

     Defendant-Intervenors.

---

## ORDER

---

This case concerns whether the United States Office of Surface Mining, Reclamation, and Enforcement ("OSM"), the Western Regional Director of OSM, and the Secretary of the Interior complied with the National Environmental Policy Act ("NEPA") when they approved two mining plan modifications. The plaintiff contends that the defendants failed to comply with either of NEPA's primary requirements – they neither involved the public nor took a hard look at the environmental impacts of the proposed modifications. Based on a review of the briefs and relevant filings as well as the positions taken during oral argument, the Court agrees. However, for reasons explained later, the Court does not agree with all of the aspects of the remedy advocated by the plaintiff.

1

## I.   BACKGROUND

### A.  The Parties

The plaintiff, WildEarth Guardians (hereinafter "Guardians"), is a non-profit membership organization with over 43,000 members.  Guardians and its members are "dedicated to protecting and restoring the wildlife, wild places, and wild rivers of the American West."  Amended Petition for Review of Agency Action [ECF No. 35] ¶ 8.  In furtherance of these goals, they "work to replace fossil fuels with clean, renewable energy in order to safeguard public health, the environment, and the Earth's climate."  *Id.*  Guardians alleges that some of its members live, work, recreate, and conduct other activities on lands affected by the mining plan approvals at issue in this case.  *Id.* ¶ 9.  These individuals "have a substantial interest in ensuring they breathe the cleanest air possible," as well as keeping "intact ecosystems free from permanent contamination of riverine habitats that destroy fish populations."  *Id.*  Guardians claims that its members are "harmed by the aesthetic and environmental impacts of coal mining" at the two locations at issue in this case.  *Id.*

The Secretary of the United States Department of the Interior is the ultimate decisionmaker with respect to mining plans.  OSM, a bureau within the Department, has the initial responsibility for evaluating the environmental impacts of proposed mining plans or revisions of such plans and for making recommendations to the Secretary.  Al Klein and S.M.R. Jewell are being sued in their official capacities as the Western Regional Director of OSM and the Secretary of the Interior, respectively.  Although OSM and the Secretary perform unique functions – the former recommends an action while the latter decides which action to take – both are responsible for ensuring compliance with NEPA.  The two intervenor-defendants, Colowyo

Coal Company, LP and Trapper Mining, Inc., are the companies that petitioned for and received the mining plan modifications at issue in this case.

As noted earlier, Guardians challenges the approval of both mining plan modifications on the basis that OSM failed to comply with NEPA's public notice and hard look requirements. Before discussing the substance of these arguments, I briefly summarize the laws applicable to this case, then address various procedural issues raised by the defendants and intervenors, and finally turn to the merits of the NEPA claims.

**B.  Relevant Laws**

NEPA is a procedural statute designed to ensure public participation and transparent decisionmaking by federal agencies. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  Federal agencies must gather public input about a proposed action so that its consequences may be studied before it is undertaken. *See, e.g.*, 42 U.S.C. § 4321; 40 C.F.R. § 1501.1; *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989).  "By focusing both agency and public attention on the environmental effects of proposed actions, NEPA facilitates informed decisionmaking by agencies and allows the political process to check those decisions." *New Mexico ex rel. Richardson v. Bureau of Land Management*, 565 F.3d 683, 703 (10th Cir. 2009).  These procedural requirements are not mere formalities.  As expressed by the Tenth Circuit, "NEPA places upon federal agencies the obligation to consider every significant aspect of the environmental impact of a proposed action.  It also ensures that an agency will inform the public that it has considered environmental concerns in its decision-making process." *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1177–78 (10th Cir. 2008) (internal quotation and citations omitted).

The Mineral Leasing Act governs the leasing of public lands for developing deposits of federally owned coal, petroleum, natural gas, and other minerals.  The Act provides that "[p]rior to taking any action on a leasehold which might cause a significant disturbance of the environment, the lessee shall submit for the Secretary's approval an operation and reclamation plan.  The Secretary shall approve or disapprove the plan or require that it be modified."  30 U.S.C. § 207(c).

OSM is tasked with implementing and enforcing the Surface Mining Control and Reclamation Act of 1977 ("SMCRA").  It is "a comprehensive statute designed to 'establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations.'"  *See Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 268 (1981) (quoting 30 U.S.C. § 1202(a)).  Under SMCRA, a state may enter into a cooperative agreement with the Secretary to provide for its own regulation of surface coal mining and reclamation operations on federal lands within the state.  *See* 30 U.S.C. § 1273(c).  However, the Secretary may not delegate to the state her responsibility to approve mining plans.  *See id.*; 30 C.F.R. § 745.13(i).  The Secretary likewise cannot delegate her duty to comply with NEPA.  *See* 30 C.F.R. § 745.13(b).  Pursuant to such a cooperative agreement, Colorado has had primary jurisdiction over the regulation of surface coal mining within its borders since 1980, exercising its authority through the Colorado Division of Reclamation, Mining and Safety ("CDRMS").  *See* 30 C.F.R. § 906.10.  The Secretary of the Interior, however, maintains ongoing authority to oversee Colorado's implementation of its regulatory program.  *See, e.g.*, 30 U.S.C. § 1271(b).

OSM makes recommendations to the Secretary of the Interior as to whether mining plans should be approved, disapproved, or conditionally approved contingent upon modifications.  30

C.F.R. § 746.13.  At a minimum, a mining plan must be compliant with the applicable requirements of federal laws, regulations, and executive orders, with the information contained therein prepared in compliance with NEPA.  *Id.*  The Secretary heavily relies on OSM in ensuring she is adequately informed before approving a mining plan.  However, her independent judgment is still required, and no surface mining or reclamation operations may begin without her approval.  *See* 30 C.F.R. § 746.11(a); *S. Utah Wilderness Alliance v. Office of Surface Mining Reclamation & Enforcement*, 620 F.3d 1227, 1243 (10th Cir. 2010).

"An approved mining plan shall remain in effect until modified, cancelled or withdrawn and shall be binding on any person conducting mining under the approved mining plan."  30 C.F.R. § 746.17(b).  If a lessee seeks to extend coal mining and reclamation operations onto previously unmined federal lands, a mining plan modification is required.  30 C.F.R. § 746.18(d).  The portion of the modified plan addressing new land areas is subject to the full standards applicable to new applications for mining leases under SMCRA.  30 U.S.C. § 1256(d)(2).

### C.  The Agency Decisions

There are two mines whose mining plan modifications are at issue in this case: the Colowyo Mine and the Trapper Mine.[1]

Colowyo

The Colowyo Mine, which is located approximately twenty-eight miles south of Craig, Colorado, has been in operation since 1977.  It obtained its first state mining permit from the state agency, CDRMS, in 1982.  The Secretary of the Interior approved the Colowyo Mine's first

---

[1] Because this case concerns two agency decisions, the Court cites to the administrative record related to the Colowyo Mine as "COLOWYO" followed by the page number and to the administrative record related to the Trapper Mine as "TRAPPER" followed by the page number.

mining plan for federal coal in 1983.  Since this time, the Secretary has approved three mining plan modifications, not including the one presently at issue.

At issue here, on July 3, 2006, Colowyo submitted a permit application package to CDRMS seeking a permit revision to federal coal leases C-0123476, C-29225, and C-29226. The permit revisions increased the approved mining area by 6,050 acres, adding 5,219 acres of federal coal for recovery.  The revisions did not extend the life of the mine.[2]

During the state permitting process, Colowyo published notice of its permit application package in two local newspapers, the *Craig Daily Press* and the *Herald Times*, for four consecutive weeks ending on August 18, 2006.  COLOWYO 5.  CDRMS then published notice of its proposed decision to approve the permit revision on May 4, 2007, which began a thirty-day public comment period.  No requests were received for a public hearing, and CDRMS approved the permit revision on June 8, 2007.  COLOWYO 8.

Meanwhile, Colowyo notified OSM of its permit revision application.  In reviewing the application, OSM concluded that a mining plan modification was needed because of the change in location and amount of federal coal to be mined.  OSM prepared an Environmental Assessment ("EA") entitled *Supplemental Environmental Assessment for Colowyo Mine Federal Coal Leases C-0123476, C-29225, and C-29226* ("Colowyo EA").  The Colowyo EA referenced older NEPA and non-NEPA documents and concluded that the modification would not result in significant environmental impacts.  Accordingly, OSM issued a Finding of No Significant Impact ("FONSI") on May 8, 2007.  COLOWYO 12.  OSM recommended that the mining plan modification be approved, and on June 15, 2007 the Assistant Secretary of the Interior (acting on

---

[2] Although the plaintiff contends that the modifications extended the life of the mine by eleven years, a review of the administrative record shows that the life of mining operations was anticipated to continue for eleven years prior to approval of the modifications, which were expected to have no impact on the mine's longevity.  *See* COLOWYO 2–3, 11.

behalf of the Secretary) adopted the recommendation.  COLOWYO 7.  Thus, the modification

under review in this case was approved nearly six years before the present case was filed and

approximately eight years before the present date.

Trapper

The Trapper Mine, which is located approximately six miles south of Craig, Colorado,

has been in operation since 1976.  It obtained its first state mining permit from CDRMS in 1982

and received the Secretary's approval of its first mining plan for federal coal in 1983.  Since this

time, the Secretary has approved one mining plan modification, not including the one presently

at issue.

On November 5, 2007, Trapper submitted a permit application package to CDRMS

seeking a permit revision to federal coal leases C-07519 and C-079641.  The permit revisions

anticipated recovery of approximately 8.1 million tons of federal coal, disturbing 312 acres of

land previously affected by a landslide.  The revisions did not increase the life of the mine.

During the state permitting process, Trapper first published notice of its permit

application package and the opportunity to comment in the *Craig Daily Press* on February 19,

2009.  TRAPPER 15; [ECF No. 58 at 10 n.3].[3]  Additional notices were published in the same

newspaper four times in July 2009.  *Id.*  CDRMS then published notice of its proposed approval

on or around September 24, 2009.  *See* TRAPPER 13, 15.  On October 23, 2009, after no

comments or requests for a public hearing were received, CDRMS approved the permit revision.

*See id.*

At the same time, Trapper notified OSM of its permit revision application.  As with the

Colowyo Mine, OSM concluded that the Trapper permit revisions necessitated a mining plan

modification because of the change in location and amount of federal coal to be mined.  OSM

---

[3] The administrative record accidentally reflects that Trapper published notice in the *Steamboat Pilot*.

prepared an EA entitled *Supplemental Environmental Assessment for the Trapper Mine Federal Coal Leases C-07519 and C-079641* ("Trapper EA").  The Trapper EA, like the Colowyo EA, referenced older NEPA and non-NEPA documents to conclude that the modification would not result in significant environmental impacts.  On October 26, 2009, OSM issued a FONSI and recommended that the modified mining plan be approved.  On November 27, 2009, the Assistant Secretary of the Interior (acting on behalf of the Secretary) approved the mining plan.  This approval occurred just over three years before the filing of the present suit and about five and a half years before today.

OSM gave no public notice and sought no public input while drafting the Colowyo and Trapper EAs.  After completing them, OSM placed both EAs and their related FONSIs in its public reading room located in Denver, Colorado without providing notice that it had done so.

### D. Guardians' Challenges

Guardians challenges the approval of these mining plan modifications on two grounds.  First, it contends that OSM violated NEPA by failing to seek public involvement during the review process and by failing to publish notice of the resulting EAs and FONSIs.  Second, it argues that OSM failed to take a "hard look" at the environmental impacts of the proposed expansions before issuing the FONSIs and approving the mining plans, also in violation of NEPA.

The plaintiff seeks the following relief: (1) a declaration that the government defendants violated NEPA and the APA; (2) an order vacating and remanding the approval of both mining plan modifications; (3) an order enjoining the government defendants from reissuing the mining plan modification approvals until such time as they have demonstrated compliance with NEPA and the APA; (4) an order requiring the government defendants to inform the intervenor-

defendants that their mining plan authorizations have been vacated, and that new operations at

the mines are prohibited until the government defendants have demonstrated compliance with

NEPA and the APA; and (5) plaintiff's costs of litigation, reasonable attorney's fees pursuant to

the Equal Access to Justice Act, 28 U.S.C. § 2412, and such additional relief as the Court deems

proper.

## II.   <u>ANALYSIS</u>

Judicial review of agency compliance with NEPA is deferential.  *See Marsh*, 490 U.S. at

377.  By law, this Court may only set aside an agency's decision if, after a review of the entire

administrative record, the Court finds that the decision was "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see also Davis v.*

*Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002).

> An agency's decision is arbitrary and capricious if the agency (1) entirely failed to
> consider an important aspect of the problem, (2) offered an explanation for its
> decision that runs counter to the evidence before the agency, or is so implausible
> that it could not be ascribed to a difference in view or the product of agency
> expertise, (3) failed to base its decision on consideration of the relevant factors, or
> (4) made a clear error of judgment.  Deficiencies . . . that are mere "flyspecks"
> and do not defeat NEPA's goals of informed decisionmaking and informed public
> comment will not lead to reversal.

*New Mexico ex rel. Richardson*, 565 F.3d at 704 (internal quotation marks and citations omitted).

The plaintiff bears the burden of proof on the question of whether an agency's decision

was arbitrary or capricious.  *See Krueger*, 513 F.3d at 1176 (explaining that the agency's

decision is presumed valid).  This Court cannot substitute its own judgment for the agency's

judgment.  *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 555

(1978).  "[D]eference to the agency is especially strong where the challenged decisions involve

technical or scientific matters within the agency's area of expertise."  *Wyoming v. U.S. Dep't of*

*Agric.*, 661 F.3d 1209, 1246 (10th Cir. 2011) (quoting *Morris v. U.S. Nuclear Regulatory Comm'n*, 598 F.3d 677, 691 (10th Cir. 2010)).

However, the Court must make a searching review of the basis for the agency's decision. And, if the agency simply has not acted, such as the claim that the OSM provided no public notice or opportunity for public involvement with respect to its actions on the two mining plan revisions, the Court may not "defer to a void." *Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1121 (9th Cir. 2010).

### A. Standing.

"[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Standing has three basic elements:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 560–61 (internal citations, quotation marks and alterations omitted).

OSM argues that Guardians lacks organizational standing to challenge the mining plan approvals because it has not sufficiently alleged an injury in fact. In the alternative, Trapper contends that Guardians lacks standing because the alleged harms are non-redressable. In response, Guardians insists that it has met all of the Article III standing requirements: OSM's failure properly to analyze the environmental impacts of the mine expansions increases the risk that Guardians' members will suffer harm to their aesthetic and recreational interests when they use the public lands in the vicinity of the mines; the increased risk of harm is fairly traceable to

this omission; and the risk of harm would be redressed by a Court order requiring OSM and the Secretary to undergo a proper environmental analysis under NEPA.  The Court agrees with the plaintiff that the conditions for standing have been met.

    1. Injury in Fact.

    "The 'risk implied by a violation of NEPA is that real environmental harm will occur through inadequate foresight and deliberation' by the acting federal agency." *Catron Cnty. Bd. of Comm'rs, New Mexico v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1433 (10th Cir. 1996) (quoting *Sierra Club v. Marsh*, 872 F.2d 497, 504 (1st Cir.1989) (Breyer, J.)).  In turn, "when a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered." *Com. of Mass. v. Watt*, 716 F.2d 946, 952 (1st Cir. 1983) (Breyer, J.).

    As such, a NEPA plaintiff need only show "1) that in making its decision without following the NEPA's procedures, the agency created an increased risk of actual, threatened or imminent environmental harm; and 2) that this increased risk of environmental harm injures [the plaintiff's] concrete interest." *Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256, 1265 (10th Cir. 2002).  Of course, "a plaintiff must also show that it is among the injured." *Diné Citizens Against Ruining our Env't v. Klein*, 747 F. Supp. 2d 1234, 1244 (D. Colo. 2010).  Where the plaintiff is an organization, the plaintiff-organization must "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009).

    OSM contends that Guardians has not established an injury in fact because the declaration of Jeremy Nichols, an employee and member of Guardians, fails to show

affirmatively and clearly that Mr. Nichols used the lands affected by the mining expansions, especially prior to the agency decisions.  I disagree.

According to Mr. Nichols, he began visiting the public lands near the Colowyo and Trapper mine sites and the Craig generating station in approximately 1999.  He has visited the lands around Craig at least once a year since 2005.  He and his family visit these areas to camp, hike, view wildlife, and float the Yampa River.  He states that during his visits he has observed the mines and their infrastructure, heavy equipment, reclamation activities, and dust generated from these activities.  He also sees the rail line to Craig and smoke from the smokestacks of the power plant.  He claims that the enjoyment of his recreational activities is lessened by visible air pollution, concerns about the effect on water quality of discharges into the Yampa River, and noise from "all this industrial activity."  Nichols Decl. [ECF No. 50-1] at ¶¶ 19–23.

The Court is not persuaded that Mr. Nichols' averments concerning the areas he visited are too generalized or too broad, or that he did not claim to have visited the affected areas prior to the approval of the mining plan modifications at issue in this case.[4]  "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)); *see also Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 448 (10th Cir. 1996) (explaining that NEPA was designed to protect a certain "zone of interests" including recreational, aesthetic, and consumptive interests in land and water).  "Neither [the Tenth Circuit] nor the Supreme Court has ever required an environmental plaintiff to show it has traversed each bit of land that will be

---

[4] This Court has neither accepted nor rejected the proposition that an environmental plaintiff must have used the affected lands *prior to* the challenged decision in order to have standing.  It is not material to the outcome in this case.

affected by a challenged agency action." *S. Utah Wilderness Alliance v. Palma*, 707 F.3d 1143, 1155 (10th Cir. 2013). "A plaintiff who has repeatedly visited a particular site, has imminent plans to do so again, and whose interests are harmed by a defendant's conduct has suffered injury in fact that is concrete and particularized." *Id.* at 1156. Using lands within view of the affected area may establish injury-in-fact when the aesthetic and recreational values of the lands would be harmed by the challenged activities.

2. Redressability.

Trapper contends that Guardians' injury is nonredressable because its mining activities are substantially complete such that vacatur and remand of the approved mining plans would not redress the injury. This argument more aptly sounds in mootness, not redressability. The doctrine of standing, unlike mootness, addresses "whether, at the inception of the litigation, the plaintiff had suffered a concrete injury that could be redressed by action of the court." *Utah Animal Rights Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1263 (10th Cir. 2004). As of October 15, 2014, Trapper was still mining coal under its permit revision. *See* Mattern Decl. [ECF No. 58-1] ¶ 22. Therefore, at the time of filing – February 27, 2013 – the plaintiff's injuries were certainly redressable through vacatur and remand.

**B. Mootness.**

Standing and mootness are closely related but distinct doctrines. "The Supreme Court has described the doctrine of mootness as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" *Utah Animal Rights Coal.*, 371 F.3d at 1263 (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68, n.22 (1997)). "'In deciding whether a case is moot, the crucial question is whether granting a present determination of the

issues offered will have some effect in the real world.  When it becomes impossible for a court to grant effective relief, a live controversy ceases to exist, and the case becomes moot.'" *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1311 (10th Cir. 2010) (quoting *Kansas Judicial Review v. Stout*, 562 F.3d 1240, 1246 (10th Cir. 2009)).  "A federal court has no power to give opinions upon moot questions or declare principles of law which cannot affect the matter in issue in the case before it."  *S. Utah Wilderness Alliance v. Smith*, 110 F.3d 724, 727 (10th Cir. 1997) (citing *Church of Scientology of California v. United States*, 506 U.S. 9, 12 (1992)).

"Ordinarily, a NEPA claim no longer presents a live controversy when the proposed action has been completed and when no effective relief is available."  *Airport Neighbors Alliance, Inc. v. United States*, 90 F.3d 426, 428 (10th Cir. 1996).  "However, courts still consider NEPA claims after the proposed action has been completed when the court can provide some remedy if it determines that an agency failed to comply with NEPA."  *Id.* at 428–29.

Trapper and Colowyo argue that this case is moot because their projects are either complete or substantially complete such that vacating and remanding the permit approvals would have no effect but to delay mine reclamation.  I agree that vacatur makes no sense as to the Trapper mine: the coal that is the subject of the plan revision at issue has been removed. However, even as to Trapper, the matter is not entirely moot.  At a minimum the Court can, and in this order does, address declaratory relief.

The status of mining at the Colowyo mine is different.  There are approximately 12 million tons of coal subject to the mining plan revision that have yet to be removed, although the infrastructure that accounts for part of the environmental harm apparently has been completed. Obviously, this Court could stop the mining at Colowyo as well as provide declaratory relief.

In short, I do not find that the matter is constitutionally moot.  Even if a case is not

constitutionally moot, however, the Court can dismiss the case as prudentially moot if it "is so

attenuated that considerations of prudence and comity for coordinate branches of government

counsel the court to stay its hand, and to withhold relief it has the *power* to grant."  *Rio Grande*

*Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1121 (10th Cir. 2010) (emphasis in

original) (quotation marks and citation omitted).  However, it is within the court's discretion

whether to dismiss a claim on the grounds of prudential mootness.  *Hillsdale Envtl. Loss*

*Prevention, Inc. v. U.S. Army Corps. of Eng'rs*, 702 F.3d 1156, 1167 (10th Cir. 2012).

Exercising its discretion, the Court declines to dismiss the plaintiff's case on the grounds of

prudential mootness.

### C.  Doctrine of Laches.

The Court also disagrees that the doctrine of laches applies.[5]  The question of laches,

which depends upon the facts and circumstances of each case, "is primarily left to the discretion

of the trial court, but that discretion is, of course, confined by recognized standards."  *Jicarilla*

*Apache Tribe v. Andrus*, 687 F.2d 1324, 1338 (10th Cir. 1982).  In order to dismiss an action

based on laches, a trial court must find both "(a) unreasonable delay in bringing suit by the party

against whom the defense is asserted and (b) prejudice to the party asserting the defense as a

result of this delay."  *Id.*  Importantly, however, "[i]n litigation brought under environmental

federal statutes, laches 'is disfavored because of the interests of the public in environmental

quality and because the agency would escape compliance with NEPA if laches were generally

---

[5] Although Trapper contends that the plaintiff's claims are barred under both the doctrines of laches and
waiver, no legal framework was submitted on the doctrine of waiver.  Therefore, the Court reviews the
basis for dismissal only under the doctrine of laches, which is argued by both Trapper and Colowyo.

applied, thus defeating Congress' environmental policy.'" *Biodiversity Conservation Alliance v. Jiron*, 762 F.3d 1036, 1092 (10th Cir. 2014) (quoting *Jicarilla*, 687 F.2d at 1337–38).

Evidently, there was a delay of several years between the approvals of the mining plan revisions and the filing of this lawsuit. However, that cannot be blamed on Guardians. OSM did not comply with its most basic NEPA duty of providing public notice. Upon learning of the mining plan approvals, Guardians put their petition together and filed it reasonably promptly.[6] Nor am I persuaded that Colowyo and Trapper were unduly prejudiced by the "delay" in the filing of the suit. Colowyo states that if mining in the revision area had been suspended early on, Colowyo could have continued to mine coal in a previously permitted area while the legal issues were hashed out. The fact remains, however, that both Trapper and Colowyo have mined coal in the revision area since the revisions were approved. Considering both delay and prejudice (and the remedy discussed below), the Court does not find that the equitable defense of laches is applicable.

### D. Doctrine of Forfeiture.

Similarly to the laches defense put forward by the intervenor-defendants, OSM insists that Guardians forfeited its right to bring its claims because it played no role in the state proceedings leading up to the approvals. But, even if Guardians was aware of the state

---

[6] In his declaration, Mr. Nichols states that he first "fully" learned of OSM's and the Secretary's roles in approving the mining of federally leased coal in early 2012. Nichols Decl. [ECF No. 50-1] ¶ 6. Previously he had presumed that coal mining under SMCRA was "largely" delegated to states to permit and regulate. *Id.* He learned of the "full scope of responsibility" of OSM and the Secretary in March 2012 when he obtained an EA prepared by OSM for a site in Wyoming. *Id.* ¶ 7. However, during the hearing counsel for Colowyo called to the Court's attention a complaint filed by Guardians in 2008 (in support of which Mr. Nichols provided a declaration) in which Guardians appeared to understand quite well the roles of OSM and the Secretary in this process. After the hearing the government and the intervenor-defendants jointly filed a copy of that complaint as a supplement to their earlier briefing. [ECF No. 76-1]. This filing triggered a response in which Guardians essentially reiterates that because OSM did not provide public notice of its actions in the present case, the laches defense does not apply. I agree with that conclusion, but it misses the Court's point, which I expressed during the hearing. It is not appropriate to create a misleading impression – here that Mr. Nichols did not understand OSM's and the Secretary's roles in the mining plan approval process until 2012 – by parsing words.

proceedings – a proposition supported by no evidence in the record – it certainly did not forfeit its right to be notified of the *federal* administrative process.  What occurred at the state level is no excuse for OSM's failure to do its job, which included giving Guardians and other members of the public the opportunity to be involved at the federal level.

### E.  Merits.

Because there are no procedural bars to hearing this case, the Court now addresses the merits of the plaintiff's arguments.  Guardians contends that OSM violated NEPA in two distinct ways when approving the Colowyo and Trapper mining plan modifications: (1) failing to ensure that the public was appropriately involved in and notified about the mining plan approvals and (2) failing to take a hard look at certain direct and indirect environmental impacts prior to issuing the FONSIs.[7]

### 1. Public Involvement and Notice

OSM did not comply with its public notice and involvement obligations in two distinct ways.  First, it failed to notify the public of and involve the public in its review of the permit plan modifications.  It then proceeded to issue a completed EA and Finding of No Significant Impact ("FONSI") for each site without notifying the public of their availability.  Each of these omissions is in violation of NEPA.

Agencies must "[p]rovide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected."  40 C.F.R. § 1506.6(b).  They must "[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment."  40 C.F.R. §

---

[7] I focus, as the parties have, on defendant OSM because OSM is the agency charged with conducting the environmental investigation and preparing, as appropriate, either an Environmental Assessment or an Environmental Impact Statement.  In doing so, I do not ignore or diminish the fact that the Secretary could not properly approve OSM's recommendation if OSM had not fully complied with NEPA.

1500.2(d).  In doing so, NEPA ensures "that 'the most intelligent, optimally beneficial decision will ultimately be made.'"  *Or. Natural Desert*, 625 F.3d at 1100 (quoting *Calvert Cliffs' Coordinating Comm. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1114 (D.C. Cir. 1971)). Notice does not foster involvement unless environmental information is available to public officials and citizens *before* decisions are made and *before* actions are taken."  40 C.F.R. § 1500.1(b) (emphasis added).

Even when only an EA is prepared,[8] agencies are still required, "to the extent practicable," to involve environmental agencies, applicants, and the public in the preparation of the EA.  40 C.F.R. § 1501.4(b).  Thus, while a draft EA need not be circulated for public comment, the agency must make "a meaningful effort to provide information to the public affected by an agency's actions."  *Diné Citizens*, 747 F. Supp. 2d at 1262; *see also Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Engineers*, 524 F.3d 938, 953 (9th Cir. 2008) ("An agency, when preparing an EA, must provide the public with sufficient environmental information, considered in the totality of circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process."). Although what constitutes "the extent practicable" will differ in each case, here OSM made no effort whatsoever to solicit public involvement before decisions were made and actions were taken.  Inaction of this sort is in clear violation of NEPA.  As the Ninth Circuit has explained,

> Although we have not established a minimum level of public comment and participation required by the regulations governing the EA and FONSI process, we clearly have held that the regulations at issue must mean something.  It is evident, therefore, that a complete failure to involve or even inform the public about an agency's preparation of an EA and a FONSI, as was the case here, violates these regulations.

---

[8] *See infra* Part II.E.2 for distinction between EAs and Environmental Impact Statements.

*Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 970 (9th Cir. 2003) (internal citation omitted).

Furthermore, pursuant to federal regulations OSM "must notify the public of the *availability* of an environmental assessment and any associated finding of no significant impact once they have been completed." 43 C.F.R. § 46.305(c) (emphasis added). OSM did no such thing. Instead, it silently placed hard copies of its completed EAs and FONSIs on a shelf in its high-rise office here in Denver. OSM made no effort to notify the public of the existence of these documents, which renders their availability meaningless.[9]

2. "Hard Look" Review

The methods used in surface mining – blasting and the use of draglines, front-end loaders, and haul trucks – generate particulate matter and ozone precursors. Ozone and particulate matter are two of six "criteria" pollutants considered harmful to public health and the environment for which the Environmental Protection Agency ("EPA") has established National Ambient Air Quality Standards ("NAAQS") under the Clean Air Act ("CAA"). *See* 40 C.F.R. § 50.1 *et seq.* Likewise, the combustion of coal impacts the environment through the release of pollutants and an increase in greenhouse gas emissions. *See, e.g.*, *Headwaters Res., Inc. v. Illinois Union Ins. Co.*, 770 F.3d 885, 898 (10th Cir. 2014); *High Country Conservation Advocates v. United States Forest Serv.*, 52 F. Supp. 3d. 1174, 1194 (D. Colo. 2014). Guardians

---

[9] In the alternative, OSM argues that any error in failing to notify the public of the availability of the environmental documents was harmless. The harmless error rule precludes reversal of administrative proceedings unless the plaintiff can show it was prejudiced by the alleged error. *See Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993). For example, if the party challenging an agency's failure to provide public notice of an EA otherwise knew of and had access to the EA, there can be no prejudice. *See Friends of Ompompanoosuc v. F.E.R.C.*, 968 F.2d 1549, 1557 (2d Cir. 1992). In this case, however, Guardians remained unaware of the EAs and FONSIs for years. And it only became aware of them after significant mining activities had been completed. There is no denying that Guardians has been deprived of its opportunity to "reach to the effects of [the] proposed action[s] at a meaningful time," before many millions of tons of coal were mined. *Marsh*, 490 U.S. at 371. What's more, all of the defendants have moved for dismissal of this suit on the grounds that there has been too much delay to justify the relief sought. If anything, the prejudice from the lack of notice appears to be great.

maintains that OSM had a duty to take into account the direct and indirect effects of these pollutants when preparing its EAs and before issuing its FONSIs.  OSM responds that it took a hard look at these effects or, in the alternative, that it was under no such obligation.

While NEPA does not fix substantive outcomes, it requires federal agencies to take a "hard look" at the potential environmental consequences of their actions.  *Robertson*, 490 U.S. at 350.  In turn, NEPA requires federal agencies to prepare an Environmental Impact Statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  As an alternative or precursor to an EIS, an agency may prepare an EA to "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."  40 C.F.R. § 1508.9(a)(1).  The EA, while typically a more concise analysis than an EIS, must still evaluate the "need for the proposal, . . . alternatives as required by [NEPA] section 102(2)(E), [and] the environmental impacts of the proposed action and alternatives."  40 C.F.R. § 1508.9(b).  Importantly, the "hard look" requirement applies equally to an EA as it does to an EIS.  *See, e.g.*, *Colorado Envtl. Coal. v. Office of Legacy Mgmt.*, 819 F. Supp. 2d 1193, 1207–11 (D. Colo. 2011) *amended on reconsideration,* No. 08-CV-01624-WJM-MJW, 2012 WL 628547 (D. Colo. Feb. 27, 2012); *Diné Citizens*, 747 F. Supp. 2d at 1256–57.  If the agency concludes that the action will not significantly impact the environment, it may issue a FONSI.  40 C.F.R. § 1508.13.

OSM prepared short, four-page EAs for both the Colowyo and Trapper Mine applications.  COLOWYO 13-16; TRAPPER 681–84.  The Colowyo EA purports to supplement seven previous studies and EAs prepared by BLM and OSM over the last two to four decades,

with dates ranging from 1975 to 2001.[10]  COLOWYO 15.  OSM explains that these "previously

prepared environmental documents identify and discuss the environmental impacts of leasing

and mining the coal resources in Federal leases C-0123476, C-29225, and C-29226," although no

citations are provided in support of this declaration.[11]  *Id.*  OSM found that these documents, in

combination with the proposed decision and findings of CDRMS, "accurately assesse[d] the

environmental impacts of mining."  *Id.*  The agency then concluded that "[a]ll of the effects of

mining Federal leases C-0123476, C-29225, and C-29226 will be mitigated during the mining

operations or upon reclamation of the land at the conclusion of mining."  *Id.* at 16.  Based on its

analysis, OSM found that there would be no significant impact resulting from the expansion of

the Colowyo Mine.  This determination resulted in the issuance of a FONSI.  *Id.* at 12.

 The Trapper EA also relied on a number of previously prepared documents, with dates

ranging from 1974 to 1988.[12]  TRAPPER 683.  OSM found that these "previously prepared

environmental documents identify and discuss the environmental impacts of leasing and mining

the coal resources in Federal leases C-07519 and C-079641," though once again no citations are

---

[10] The EAs listed are as follows: BLM, *Taylor Creek Study Site: Axial Basin Coal Field Resource and Potential Reclamation*, 1975; BLM, *Northwest Colorado Coal Environmental Statement*, 1977; BLM, *Northwest Supplemental Report*, 1979; OSM, *Environmental Assessment, Proposed Increase in Production of the Colowyo Mine*, August 1980; OSM, *Environmental Assessment, Colowyo Mine, Mine Plan Approval*, February 1989; OSM, *Environmental Assessment, Colowyo Mine, Federal Lease C-29224, Mining Plan Modification, Moffat County, Colorado*, July 1992; OSM, *Environmental Assessment, Colowyo Mine, Federal Leases C-29225 and C-29226, Mining Plan Modification, Moffat and Rio Blanco Counties, Colorado*, July 2001.  COLOWYO 15.

[11] To properly incorporate material into a NEPA document by reference, the agency must cite to pertinent page numbers or other relevant identifying information, as well as briefly describe its contents.  *See* 43 C.F.R. § 46.135(b); 40 C.F.R. § 1502.21.

[12] The EAs listed are as follows: U.S. Department of Agriculture – Rural Electrification Administration, *Yampa Project Final Environmental Assessment, USDA-REA-ES (ADM)-74-2-f*, July 1974; BLM, *Environmental Statement, Northwest Colorado Coal, (FES-77-1)*, January 1977; BLM, *Northwest Supplemental Report*, 1979; The OSM contracted, Karman Tempo, *Cumulative Hydrologic Assessment: Effects of Coal Mining on the Yampa River Basin, Moffat and Routt Counties, Colorado*, January 1982; OSM, *Environmental Assessment, Trapper Mining, Inc., Trapper Mine*, April 1983; OSM, *Environmental Assessment, Trapper Mine, Modified Mining Plan*, April 1988.  TRAPPER 683.

provided in support of this declaration. *Id.* at 684. OSM then found that these documents, in combination with the proposed decision and findings of CDRMS, "accurately assesse[d] the environmental impacts of mining." *Id.* The agency ultimately concluded that there would be no significant impact resulting from the expansion of the Trapper Mine. *Id.* at 25.

When reviewing a FONSI, the Court "must determine whether the agency acted arbitrarily and capriciously in concluding that the proposed action 'will not have a significant effect on the human environment.'" *Utah Envtl. Cong. v. Russell*, 518 F.3d 817, 824 (10th Cir. 2008) (quoting *Mineta*, 302 F.3d at 1112 (quoting 40 C.F.R. § 1508.13)). "NEPA requires that we review the record to ascertain whether the agency decision is founded on a reasoned evaluation of the relevant factors." *Utah Shared Access Alliance v. U.S. Forest Serv.*, 288 F.3d 1205, 1213 (10th Cir. 2002) (citing *Marsh*, 490 U.S. at 373–74). Only once the Court is satisfied that the agency's exercise of discretion is truly informed must it defer to the agency. *Marsh*, 490 U.S. at 374.

Guardians insists that OSM failed to take a hard look at the direct and indirect effects on air and water quality resulting from the expansion of the Colowyo and Trapper Mines before issuing its FONSIs. OSM and the intervenor-defendants respond with a variety of arguments ranging from claiming that OSM had no obligation to analyze these effects to contending that OSM took a sufficiently hard look at them. The Court addresses each argument in turn.

<u>Procedural Arguments</u>

First, OSM argues that its impact analyses were sufficient because its role is "simply to review mining plan approvals" issued by the state regulating body, here CDRMS. OSM maintains that it may not "usurp the state's role as regulator of surface mining, reclamation, water quality, and air quality . . . ." [ECF No. 56 at 19]. Usurping is one thing; rubber stamping

is another.  OSM cannot shirk its own NEPA obligations.  *See* 30 C.F.R. § 745.13(b); *see also State of N.C. v. F.A.A.*, 957 F.2d 1125, 1129–30 (4th Cir. 1992) ("Section 102(2) of NEPA, 42 U.S.C. § 4332(2), directs all federal agencies to comply with the Act.  This provision precludes an agency from avoiding the Act's requirements by simply relying on another agency's conclusions about a federal action's impact on the environment.").  The federal-state cooperative agreement between the State of Colorado and the Secretary of the Interior states that DOI "shall concurrently carry out its responsibilities which cannot be delegated to the State under the MLA, National Environmental Policy Act (NEPA), and other public laws . . . ."  30 C.F.R. § 906.30 Art. VI ¶ 8.

Next, OSM argues that any attempt to regulate air quality would be outside of its limited power to regulate surface mining and reclamation.  OSM mischaracterizes the plaintiff's challenge.  Guardians does not contend that OSM can regulate air quality.  Instead, it maintains that OSM must take sufficient steps and conduct adequate analyses to determine whether a proposed action taken pursuant to SMCRA will have a significant effect on the human environment, including the surrounding air and water.

On a peripheral note, Colowyo argues that any conduct *regulated* under the Clean Air Act is exempt from NEPA analysis.  Colowyo is incorrect.  The exemption states: "No action *taken* under the Clean Air Act shall be deemed a major Federal action significantly affecting the quality of the human environment within the meaning of the National Environmental Policy Act of 1969."  15 U.S.C. § 793(c)(1) (internal citations omitted) (emphasis added).  These actions are exempt because the Clean Air Act already "serves the purpose of NEPA," for example by requiring the EPA "to consider and balance the environmental impact, the costs, and the alternatives; to give opportunity for public comment; and to publish the results of the

decisionmaking" when promulgating air quality standards. *Pac. Legal Found. v. Andrus*, 657

F.2d 829, 834 (6th Cir. 1981). However, the Colowyo and Trapper FONSIs were issued

pursuant to SMCRA, not the Clean Air Act, even though they remain regulated under the latter.

 The question posed by the plaintiff is not whether the increased mining will result in a

release of particulate matter and ozone precursors in excess of the NAAQS, but whether the

increased emissions will have a significant impact on the environment. One can imagine a

situation, for example, where the particulate and ozone emissions from each coal mine in a

geographic area complied with Clean Air Act standards but, collectively, they significantly

impacted the environment. It is the duty of OSM to determine whether a mining plan

modification would contribute to such an effect, whether or not the mine is otherwise in

compliance with the Clean Air Act's emissions standards. During oral argument, even OSM's

counsel acknowledged that he does not read the Clean Air Act exemption to mean that OSM

cannot or need not assess the impacts of mining activities on air quality.

 <u>Substantive Arguments</u>

 *Direct Effects*

 In the alternative, OSM argues that it took a sufficiently hard look at the **direct** adverse

air impacts before issuing the FONSIs. Direct effects are effects that "are caused by the action

and occur at the same time and place." 40 C.F.R. § 1508.8(a). In particular, OSM maintains that

it adequately and properly relied on previously compiled environmental documents that "did in

fact address impacts of both fugitive dust (also referred to as 'total suspended particulates' or

'particulate matter') from surface mining operations in the region, as well as emissions of

nitrogen oxides, an essential element in ozone formation," citing TRAPPER 1691–1715 and

COLOWYO 3228–3251 in support.  [ECF NO. 56 at 20].  These citations are made to the same

pages in the same report, BLM's *Northwest Supplemental Report* from 1979.

Upon reviewing the report, the Court finds that OSM did not adequately or properly rely

on its contents, which are considerably outdated.  The report states that it provides a "regional

cumulative analysis of federal coal development that may occur in northwest Colorado through

1990."  TRAPPER 1443;[13] *see also id.* at 1691 ("The impacts on the ambient concentrations of

total suspended particulates (TSP), sulfur dioxide ($SO_2$), nitrogen dioxide ($NO_2$), carbon

monoxide (CO) and non-methane hydrocarbons (NMHC) are examined for 1980, 1985, and

1990.").  Meanwhile, the mining plan modifications in this case were filed in 2007 and 2009.

Furthermore, these pollutant concentrations were compared to the ambient air quality standards

from 1979.  *Id.*  No one disputes that the standards have become more stringent since that time.

And yet there appears to have been no analysis by OSM of the pollutant concentrations with

respect to the current air quality standards, even assuming the 1990 emissions projections were

sufficiently relied upon.

OSM is responsible for supplementing reports when there have been "significant new

circumstances or information relevant to environmental concerns and bearing on the proposed

action or its impacts."  40 C.F.R. § 1502.9(c)(ii).  Trapper argues that because the impacts of

mining are not new, the change in air quality standards does not demand that OSM conduct

additional analysis with respect to direct effects on air quality.  The Court disagrees.  First,

although the defendant parties do not acknowledge that the report itself is outdated, it was never

intended to assess or predict pollutant concentrations past 1990.  Second, a change in air quality

emissions standards would, at a minimum, require OSM to consider how the new standards

---

[13] For ease of reference the Court will refer solely to the report in the Trapper administrative record.

impact its analysis of whether a proposed action "significantly" affects the quality of the human environment.  More stringent standards would arguably make the same action more significant.

Finally, Colowyo argues that because the state issued an air quality permit, any air quality assessment performed by OSM would be duplicative.  But under NEPA, federal agencies must take a hard look at the environmental impacts of a proposed action even if the action is compliant with other laws and regulations.  *See S. Fork Band Council Of W. Shoshone Of Nevada v. U.S. Dep't of Interior*, 588 F.3d 718, 726 (9th Cir. 2009).

*Indirect Effects*

Next, the plaintiff argues that OSM did not consider the impacts of coal combustion as an **indirect** effect on air and water quality.  Indirect effects are effects that "are caused by the action and are later in time or farther removed in distance [than direct impacts], but are still reasonably foreseeable."  40 C.F.R. § 1508.8(b).  "Indirect effects may include . . . effects on air and water and other natural systems, including ecosystems."  *Id.*  OSM insists that NEPA does not require an analysis of the indirect impacts of coal combustion in this set of circumstances.  Trapper takes this argument one step further and maintains that OSM had no authority to take into account these indirect effects.[14]  Going beyond both, Colowyo contends that coal combustion is not an actual "effect" of the mining plan within the meaning of NEPA because a mining plan does not *cause* coal combustion.

Beginning with Colowyo's claim, it argues that there is a fundamental difference between approving a lease bid, which would cause the combustion of coal, and approving a mining plan, which simply specifies how the coal will be extracted.  According to Colowyo, coal lessees have

---

[14] Trapper adds that OSM lacks the authority to regulate indirect adverse air quality from coal combustion.  However, the plaintiff does not argue that OSM has any regulatory authority in this arena.  As discussed earlier, the challenge concerns OSM's failure to take a hard look at the direct and indirect effects on air and water quality before making findings of no significant impact and recommending approval of the mining plan modifications.

a duty diligently to mine commercial quantities of leased coal.  *See* 30 U.S.C. § 207(a) (setting

term of federal coal lease for twenty years while adding that "[a]ny lease which is not producing

[coal] in commercial quantities at the end of ten years shall be terminated"); 30 U.S.C. §

207(b)(1) (requiring that each lease be subject to the conditions of diligent development and

continued operation of the mine).  Mining plans, on the other hand, simply operationalize the

lease.  Yet this case is not about mining plans that operationalize a lease.  It is about permit

renewal applications that became mining plan *modifications* on account of their proposal to

expand mining to previously untouched federal lands.  As SMCRA makes clear, any proposed

expansion of mining operations beyond the boundaries authorized by an existing permit "shall be

subject to the full standards applicable to new applications" for mining leases.  30 U.S.C. §

1256(d)(2).[15]  The approval of these mining plan modifications has increased the area of federal

land on which mining has occurred and has, in turn, led to an increase in the amount of federal

coal available for combustion.  Coal combustion is therefore an indirect effect of the approval of

the mining plan modifications.[16]

Next, OSM argues that NEPA does not require an analysis of the impacts of coal

combustion because its "statutory role in this case is limited to the narrow task of approving

mining plans developed by the state in an exercise of its primary jurisdiction."  [ECF No. 56 at

23].  According to OSM, it "simply has no authority to include restrictions in its approval

---

[15] During oral argument, counsel for Trapper stated for the first time that Trapper's mining plan modification did not expand or increase the previously permitted mine boundaries set by Colorado.  No evidence was submitted to supplement the record with respect to this claim, nor did counsel explain how this discrepancy impacted his client's case.  As discussed earlier, OSM only becomes involved in the permit modification process if a company proposes to expand its mining operations onto previously un-mined federal lands containing federal coal.  According to OSM, Trapper did just that.  If Trapper disagreed, the appropriate time to have raised this defense would have been in a motion to dismiss or, at the latest, in the original set of briefing.

[16] Trapper's argument is made in the same vein and fails for the same reason.

decisions directing how, when, at what rate, or under what technology coal would be burned."

*Id.* While OSM is not required to consider the effects of an action that it "has no ability to

prevent," *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 770 (2004), the plaintiff is not

demanding that OSM regulate the combustion of the coal.  Instead, it rightly insists that OSM

must take into account the effects of such combustion when determining whether there will be a

significant impact on the environment, a necessary step before taking any action on a mining

plan.

Furthermore, the Court is not persuaded by OSM's attempt to distinguish this case from

those in which the approval of a mining plan leads to an increase in the market share of coal.

The Court understands that the coal mined under these two lease modifications is mined solely

for use by the Craig Power Plant.  But just because the coal is not entering the free marketplace

does not mean that its combustion is not reasonably foreseeable.  Quite the opposite, in fact.  The

interdependence between the mines and the Craig Power Plant effectively guarantees the

foreseeability of combustion-related effects.  As Judge Kane recently explained,

> Unlike a scenario in which a coal mine markets its coal freely to multiple buyers,
> each of whom uses that coal in different applications under different constraints,
> there is virtually no uncertainty regarding when, where, and how the coal mined
> as a result of NTEC's proposed mine expansion will be combusted.  All of the
> coal mined from Area IV North will be combusted at the Four Corners Power
> Plant.  Because there is no uncertainty as to the location, the method, or the timing
> of this combustion, it is possible to predict with certainty the combustion-related
> environmental impacts.

*Diné Citizens Against Ruining Our Env't v. United States Office of Surface Mining Reclamation*

*& Enforcement*, --- F. Supp. 3d. ----, No. CV 12-CV-01275-JLK, 2015 WL 996605, at *6 (D.

Colo. Mar. 2, 2015) (internal citations and footnote omitted).  In this case, even if the timing of

combustion is unknown, its location and method are not.  Furthermore, the timing can be

predicted, in part, by analyzing the historic rate of combustion.

Finally, the defendants argue that OSM could not take into account the effects of coal combustion because it is purely speculative when the coal will be burned, at what rate it will be used, and what emissions-control technology might be applied at the combustion stage. The Court is not convinced. Agencies need not have perfect foresight when considering indirect effects, effects which by definition are later in time or farther removed in distance than direct ones. "[W]hen the *nature* of the effect is reasonably foreseeable but its *extent* is not . . . the agency may not simply ignore the effect." *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 549 (8th Cir. 2003) (emphasis in original).

In a recent case, I found that insofar as a federal agency was able to estimate the amount of coal to be mined it could likewise predict the environmental effects of the combustion of that coal. *See High Country*, 52 F. Supp. 3d. at 1196. I stand by that holding. Both the Colowyo and Trapper EAs estimate the increase in coal production resulting from the proposed lease expansions on each mine. *See* COLOWYO 13; TRAPPER 682. If OSM can predict how much coal will be produced, it can likewise attempt to predict the environmental effects of its combustion. Just because it does not possess perfect foresight as to the timing or rate of combustion or as to the state of future emissions technology does not mean that it can ignore the effects completely.[17]

### F.  Remedies.

Federal law typically directs this Court to hold unlawful and to set aside agency action found to be arbitrary, capricious, or otherwise not in accordance with the law. 5 U.S.C. §

---

[17] The defendants misread *WildEarth Guardians v. Jewell*, 738 F.3d 298 (D. C. Cir. 2013) ("*West Antelope II*"), insofar as they believe that it says otherwise. The *West Antelope II* court never found that BLM was excused from considering the effects of coal combustion because they were too speculative. In fact, BLM had projected the increase in greenhouse gas emissions resulting from coal combustion – an analysis OSM did not attempt in either the Trapper or Colowyo EAs – and the effects of those emissions on global climate change. The court refused to fault BLM, however, for explaining that its projections were speculative. 738 F.3d at 309.

706(2)(A).  Nonetheless, the APA preserves the power of the courts to fashion an alternative remedy on other equitable or legal grounds.  5 U.S.C. § 702.  "Nothing in the Administrative Procedure Act . . . restricts the range of equitable remedies available to the Court, including the issuance of declaratory relief without setting aside the agency action."  *Pac. Rivers Council v. U.S. Forest Serv.*, 942 F. Supp. 2d 1014, 1018 (E.D. Cal. 2013) (citing 5 U.S.C. § 702; 5 U.S.C. § 703).  "Whether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *California Communities Against Toxics v. U.S. E.P.A.*, 688 F.3d 989, 992 (9th Cir. 2012) (quoting *Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir.1993)).

The Court concludes that the following remedies are necessary and sufficient in the circumstances of this case:

1.  The Court declares that OSM violated NEPA by failing to notify the public of and involve the public in the preparation of the Colowyo and Trapper EAs and by failing to notify the public once the EAs had been completed and the FONSIs had been issued.  OSM also violated NEPA by failing to take a hard look at the direct and indirect effects of the increased mining operations before determining that there would be no significant impact on the environment.  The Secretary of the Interior violated NEPA by approving both of these mining plan modifications in spite of these defects.

2.  With respect to the Trapper mining permit revision, vacatur makes no sense.  The federal coal covered by the revision has been mined.  Whatever federal coal remains will not be mined before a new permit revision is approved.

3.  With respect to the Colowyo mining permit revision, vacatur is still timely given that approximately 12 million tons of coal remain to be mined at the revision site.  However, the Court is aware that, according the Declaration of Juan Garcia, Technical Services Manager for the Colowyo mine, the mine employs nearly 250 people at full production.  Garcia Decl. [ECF No. 59-3] ¶ 4.  He represents that invalidation of the 2007 mine plan revision would likely cause layoffs if the operations were halted for any significant period, as well as "serious economic losses" to Colowyo.  *Id.* ¶¶ 14, 15.  It might also pose a hardship to the power plant which depends on Colowyo as a principal source of coal.  This is not to say that the Court would not order vacatur despite the individual hardships that would follow in an appropriate case.  *See, e.g.*, *Dine Citizens Against Ruining Our Environment*, No. 12-cv-1275-JFK, 2015 WL 1593995, at *2-3 (D. Colo. April 6, 2015); *High Country Conservation Advocates v. United States Forest Serv.*, --- F. Supp. 3d ----, No. 13-CV-01723-RBJ, 2014 WL 4470427, at *4 (D. Colo. Sept. 11, 2014).  However, given the fact that mining in this area has occurred since the mid-1970's; that the environmental impacts have been studied over the years; that the state agency considered the environmental impacts from these mining plan revisions; and that government counsel noted during the hearing that OSM has changed its notice practices and procedures, I find that the benefits of immediate vacatur do not outweigh the potential harms.

4.  Instead, the Court will defer entering a vacatur order for a period of 120 days from the date of this order.  During that period the Court expects OSM to take a hard look at the direct and indirect environmental effects of the Colowyo mining plan revision, and to provide public notice and an opportunity for public involvement before reaching its decisions.  If this process has not been completed within the 120-day window, then an order of vacatur will be immediately effective absent further court order based upon very good cause shown.

5.  The Court awards the plaintiff its <u>reasonable</u> attorney's fees and other expenses under the Equal Access to Justice Act, 28 U.S.C. § 2412, as the Court finds that the position of the United States was not substantially justified and no special circumstances make the award unjust. 28 U.S.C. § 2412(d)(1)(A).  The Court directs the parties to confer and attempt in good faith to reach an agreement to determine an amount.  If agreement is not reached, the parties may set an evidentiary hearing on the amount.

DATED this 8th day of May, 2015.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge